UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CASE NO.  1:03-CR-036 |
| | ) | |
| STEVEN L.  KITCHIN | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

　　　This matter is before the Court following the receipt of two sets of documents submitted via facsimile by the Defendant's brother, Shawn M. Kitchin, Captain, USAF, ("Capt. Kitchin") concerning the defendant's medical treatment during his federal incarceration.  These submissions, made on March 12, 2007 and March 20, 2007, were filed of record in the cause and the Court directed the Government to respond to the complaints made in the documents.  The Government promptly responded on March 22, 2007 and a hearing was scheduled for April 18, 2006.  The court ordered Dr. Michael Anderson ("Dr. Anderson"), Kitchin's primary care physician at the Federal Medical Center in Rochester, Minnesota, hereafter "FMC Rochester," to participate telephonically along with the Defendant.  Capt. Kitchin and other family members personally attended the hearing. Before proceeding further, a brief summary of the record provides necessary background in this cause.

On January 4, 2007, the Defendant, Steven Kitchin, was sentenced to 27 months imprisonment following a guilty plea in June 2003 to mail fraud (18 U.S.C. §1341) and failure to file a tax return (26 U.S.C. §7203). The lengthy expanse between the date of the Defendant's guilty plea and his sentencing date is attributable to numerous motions and/or hearings related to the Defendant's objections to the presentence investigation report as well as motions related to his medical condition. After the date of the offense in this case (and prior to sentencing), the Defendant was involved in a vehicular accident leaving him in a state of quadriplegia. The Defendant's quadriplegia, as this Court has previously recounted, (see docket #65) requires a great deal of medical care provided by others to meet the Defendant's basic needs. After careful review of the evidence relating to the Defendant's condition and consideration of the undisputed evidence presented to the court by the Bureau of Prisons that it could adequately meet the Defendant's medical needs, the undersigned denied Defendant's request for a medical departure, concluding as follows:

> While the court is sympathetic to Kitchin's belief that he will receive a lesser degree of care from the Bureau of Prisons than he receives in his home environment, this belief is not supported by any evidence that the Bureau of Prisons is unable to accommodate his medical needs. The Bureau of Prisons has repeatedly indicated that it has the facilities and personnel to provide adequate care to Kitchin while he is incarcerated. For this court to impose any meaningful imprisonment reduction, this reduction would have to be supported by an extraordinary rationale –a "World Series" explanation as the Seventh Circuit has termed it. *See Wallace*, 454 F.3d at 614 ("The district court acknowledged that it was giving Wallace a significant break – a 'World Series' break, in fact. Such a break requires, we hold, a 'World Series' explanation."). Given that the Bureau of Prisons maintains that it can accommodate Kitchin, there is simply nothing extraordinary about his circumstances to justify a reduction of the recommended guidelines range of imprisonment, much less a reduction from a term of imprisonment to probation.

Opinion and Order dated December 8, 2006, Docket # 65.

Since Kitchin's reporting to FMC Rochester, both Government and defense counsel have been inundated with telephone calls, faxes, and letters from members of Kitchin's family expressing their anxiety regarding the medical care Kitchin is receiving as well as setting out detailed complaints related to Kitchin's medical care.  This activity culminated in an attempt by Kitchin's family to directly contact the undersigned by telephone and request a meeting.  When that attempt proved futile, Capt. Kitchin faxed two lengthy series of documents to the undersigned.  Given the issues raised in the faxes, the undersigned filed the documents in the cause and requested the Government to respond.

By far, the greatest complaints relate to the physical therapy regimen available at FMC Rochester and the appropriateness of various types of medical procedures performed at the institution.  With respect to the former complaint, prior to his incarceration, the Defendant maintained some muscle mass through use of the ERGYS rehabilitation system, which includes two pieces of equipment: an ERGYS bicycle and an Easy Stand Glider.  FMC Rochester admittedly does not offer the ERGYS system and, according to a letter from Dr. Anderson, the reason for this is that the system is "innovative but unproven."  (Govt's Exh B., ¶6). Similarly, the Government submitted a memorandum dated February 9, 2007 from Jessica Feda, LCDR, United States Public Health Service wherein Ms. Feda indicates the following relating to the ERGYS system:

> I have evaluated the peer-reviewed research noted on the ERGYS site and performed a literature review to determine the efficacy of the Glider for use with quadriplegic physical therapy.  No studies were identified that mentioned the Glider in their research.  The ERGYS website lists peer-reviewed studies concerning the ERGYS or REGYS systems.  Of note, the largest sample size in any of the studies was 10 subjects.  None of the studies addressed clinically significant measures such as pressure sore prevention, cardiopulmonary event risk reduction, deep vein thrombosis prevention, improved bowel or bladder function, or decreased risk of urinary tract infections.  All of the studies appraised provided outcomes on physiologic/anatomic changes and presented speculation as to how these measures

3

may relate to clinically important variables.

(Gov't Response Exh. C).  Ms. Feda then opines that other rehabilitative equipment provided at

FMC Rochester "all provide many of the same capabilities ascribed solely to the ERGYS bike and

Glider."  *Id.*  Given the availability of this other equipment, the BOP has not provided Kitchin with

access to ERGYS equipment.

The defendant, however, believes that when the BOP indicated that it would be adequately

providing for his medical needs, it included  this equipment and, even if the BOP did not initially

intend to provide the ERGYS system, it should now.  To this end, Kitchin has submitted a letter

from the James Schorey ("Schorey") President of Therapeutic Alliances who manufactures the

ERGYS system, wherein he opines that the "ERGYS Rehabilitation System is an indispensable part

of your medical and therapeutic regimen."  (Dfdt's Exh. 3, p. 26).[1]  A similar letter from Kitchin's

neurologist, Dr. Chang, indicates his professional disagreement with Ms. Feda and that the

alternative therapeutic options  will not provide the same benefits as the ERGYS system.  Dr.

Chang also opines that if the ERGYS therapy is discontinued, "it will adversely affect Mr. Kitchin's

health...These machines are not merely experimental, but rather offer great benefits to the patients

who utilize them."  (Dfdt's Exh, 3 p. 25).  A more recent letter dated April 14, 2007, from Dr.

Chang reaffirms this position.

To further complicate this dispute, FMC Rochester has a contract with The Mayo Clinic to

provide certain necessary services to inmates.  In his letter, Schorey indicates that The Mayo Clinic

utilizes the ERGYS system and thus, Kitchin believes it should be made available to him as it is

---

[1]There is no evidence before this court that the President of Therapeutic Alliances is a medical
professional or has ever treated, assessed or otherwise had any medical evaluation performed of Kitchin.

4

a necessary and indispensable part of his rehabilitative therapy.  However, the BOP continues its refusal to provide Kitchin with this access ostensibly for the same reason it will not provide the equipment in-house, i.e., because it views the treatment as experimental and unnecessary.  In addition, Kitchin maintains that he has been told that FMC Rochester is unable to provide staffing for his transportation to the Mayo Clinic for the therapy which would be required 3 times per week for a minimum of 4 to 5 hours.

At the hearing, the undersigned discussed with Dr. Anderson whether the Easy Stand Glider which Kitchin owns and has in his home could be transported to FMC Rochester for Kitchin's use.  Dr. Anderson indicated that he would look into this possibility and discuss it with his superiors.

Moreover, Dr. Anderson indicated that Kitchin was presently scheduled for a consult[2] with an eminent neurologist at the Mayo Clinic for recommendations as to specific treatments for Kitchin, including a therapy regimen.  Dr. Anderson further indicated that the BOP typically follows such recommendations and provides whatever transportation and/or equipment is necessary to comply with the physician recommendations.  Thus, Kitchin's concerns regarding his therapy are, in fact, being addressed by Dr. Anderson, albeit not necessarily in the express fashion that Kitchin would like.

As for the second set of complaints relating to his treatment, Kitchin objects to (1) not having a consultation with a Mayo Clinic neurologist as he was told would occur upon his arrival at FMC Rochester; (2) the changing of his medications upon his arrival at FMC Rochester, (3) his

---

[2]For security reasons, Dr. Anderson could not provide the date of the consult but indicated it was scheduled in the "near future."

bowel/bladder management, and (4) the attentiveness of prison personnel to aid him with immediate medical needs and/or to help him move to avoid pressure sores.  In a letter dated March 19, 2007, Dr. Anderson has responded to each of Kitchin's complaints relating to his treatment.  His responses are summarized below:

(1)     Dr. Anderson indicates that Kitchin has been evaluated extensively prior to coming to FMC Rochester and therefore, he has not been evaluated by a neurologist from the Mayo Clinic.  Nevertheless, Jason Daube, MD., a neurologist at the Mayo Clinic has been asked to review Kitchin's case and records and advise FMC Rochester if Kitchin has rehabilitation potential that needs to be addressed.

(2)     Kitchin's medications were changed to equivalent but different generic medications upon his arrival at the federal institution.  Dr. Anderson indicates that Kitchin was taking inappropriate dosages of Baclofen (2 1/2 times the maximum recommended dose) and that the dosages were reduced with Kitchin agreement.  Kitchin was also taking a medication to elevate his blood pressure  and, in Dr. Anderson's opinion, this medication could be discontinued gradually as the Baclofen dosage decreased.

(3)     Dr. Anderson acknowledges that Kitchin did not have a bowel movement for several days after he arrived at FMC Rochester.  He is currently receiving the same bowel program as all other quadriplegics.  As for the timeliness of his care, Dr. Anderson indicates that inmates are put on a catheterization schedule which is monitored by their nurses.  According to Dr. Anderson, a schedule of every 4 hours is appropriate for Kitchin despite Kitchin's complaints that failure to catheterize him immediately will result in a stroke or heart attack within a matter of minutes.  Dr. Anderson indicates that this type of catastrophic condition does not happen.

(4)     To prevent bed sores, Kitchin is on "Group 1 preventative surface with alternating air pressure."  Dr. Anderson indicates that this is state of the art.

Gov't Response, Exh. B.

Having reviewed all of the filings and summarized them above, it is clear that many, if not all, of the complaints raised by Kitchin and his family regarding his care are the subject of professional disputes between and among medical doctors.  The record is void of any evidence of actual harm, that is, that Kitchin has, in fact, suffered any untoward consequences as a result of the medical treatment he is receiving at FMC Rochester.  There is also no medical evidence that

Kitchin's condition has deteriorated at all due to the treatment he is receiving.  Rather, as the undersigned noted during the hearing, the record is replete with complaints, areas of concern, anxiety, and speculation over Kitchin's medical care.

That said, the heart of the matter presently is what authority the undersigned has to resolve the various professional disputes contained in the record or intervene in the BOP's medical decisions relating to Kitchin's treatment.  From the various filings it appears the Kitchin seeks release from FMC Rochester because, in his opinion, the facility cannot accommodate his specialized needs.  However, under the Sentencing Reform Act, district judges have limited authority to alter sentences after their imposition:

> The court may not modify a term of imprisonment once it has been imposed except that-
> (1)    in any case-
>      (A)    the court, upon motion of the Director of the Bureau of Prisons, may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>           (i)     extraordinary and compelling reasons warrant such a reduction;  or
>           (ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);  and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission;  and
>      (B)    the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure;  and

18 U.S.C. § 3582(c).[3] Rule 35 in turn authorizes a district judge to modify a sentence within seven

---

[3]A sentence may also be modified under 18 U.S.C. §3582(c):

> (2)        in the case of a defendant who has been sentenced to a term of

days of its imposition to correct a technical error, or on the prosecutor's motion to reward substantial assistance rendered after the sentence had been imposed.

Neither of the Rule 35 circumstances pertain to Kitchin, nor do any of the exceptions in § 3582(c) assist him.   "Because §3582(c) limits the substantive authority of the district court, it is a real "jurisdictional" rule rather than a case-processing requirement." *United States v. Smith*, 438 F.3d 796, 799 (7th Cir. 2006) (citing *Eberhart v. United States*, --- U.S. ----, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005).   "It is the sort of limit that must be respected, and which we must enforce even if everyone else has ignored it."   *Id.* (citing *United States v. Lloyd*, 398 F.3d 978 (7th Cir.2005); *United States v. Vega*, 241 F.3d 910 (7th Cir.2001)).

In this case, what Kitchin is asking this court to do is to usurp the authority of the Bureau of Prisons and micro-manage his care from the bench.   There is no legal authority for this court to act in this fashion, and Kitchin's counsel conceded at the hearing that he could find no legal authority for the court to act as Kitchin desires.   Moreover, as the undersigned expressly stated at the hearing, even if the court had the *authority* to act, on the basis of the record before it, the court would not *exercise* its authority.   It is abundantly clear from the actions of the Government[4] and the recent

---

imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(*o*), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Because this provision is not relevant to Kitchin's case, it is not discussed in the main text but noted here for completion.

[4]The AUSA in this case has been extremely attentive to the complaints and anxieties of Kitchin's family and has, at every turn, made diligent attempts to contact the BOP and remedy these complaints and concerns.

actions taken by the BOP that they understand that they share a heavy burden in this case to ensure that the medical care Kitchin receives is such that it adequately protects him from physical deterioration.  As noted earlier, however, there is nothing in the record presently which supports any conclusion that any deterioration in Kitchin's condition has occurred since his reporting to FMC Rochester.

Moreover, to the extent that Kitchin has complaints about the particulars of his care, the starting point for those complaints is with FMC Rochester not with this court.  The Bureau of Prisons' regulations in effect at FMC Rochester provide a multi-level review process that a federal prisoner may utilize in order to seek formal review of an issue relating to any aspect of his confinement. 28 C.F.R. §§ 542.10-542.18. Because the Bureau of Prisons permits administrative review and because there is no indication that Kitchin is foreclosed from seeking such a review, Kitchin must exhaust his administrative remedies prior to seeking relief through the courts.[5]

Attached as an Exhibit to this Order is a copy of the Program Statement provided by FMC Rochester outlining the purpose, scope, and procedure required to institute a formal review of an inmate's confinement.  The concluding page is a form entitled "Request for Administrative Remedy Attempt at Informal Resolution." This document sets out that before filing a formal complaint, Kitchin must informally attempt to resolve his particular complaint with a staff member.  If this

---

[5] For instance, once he has exhausted his administrative remedies, Kitchin may be eligible to file a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  A § 2241 petition, however, must be brought in the district of incarceration, 28 U.S.C. § 2241(a), and in this case, Kitchin is not incarcerated in the Northern District of Indiana.  Once he has exhausted his administrative remedies, Kitchin may also, under certain circumstances, be eligible to seek relief under the Administrative Procedures Act which authorizes a court to hold unlawful and set aside any agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. See 5 U.S.C. §706(2)(A); but see 18 U.S.C. § 3625 (barring relief for certain types of agency actions including BOP actions); *Martin v. Gerlinski,* 133 F.3d 1076, 1079 (8th Cir. 1998) (finding that § 3625 precludes judicial review of agency adjudicative decisions but not of rulemaking decisions).

attempt fails, Kitchin may request form BP-229 from a staff member so that he may initiate a formal review of a complaint.

Certainly, the court is sympathetic to the anxieties and concerns of Kitchin's family regarding his care and treatment while incarcerated. It is not unusual that families are disrupted and experience anxiety and concern when a loved one engages in criminal activity that results in incarcerated. *See United States v. Gaskill*, 991 F.2d 82, 85 (3d Cir. 1993) (" Disruptions of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration."). In this particular instance perhaps the anxiety is more pronounced due to Kitchin's medical state. However, this court cannot lose sight of the fact that Kitchin pled guilty to a serious criminal enterprise and his incarceration is a consequence of that offense. For this reason, the court is mindful of the principles articulated by the First Circuit two decades ago in *United States v. Decologiero*, 821 F.2d 39, 42 (1st Cir. 1987):

> By its very nature, incarceration deprives [an inmate] of the wide choice of health care providers available in the[ir home environment], and may well interfere with his preferred mode of treatment...Yet, some of this is well beside the point. Persons forfeit a variety of freedoms in consequence of proven criminality. And, though it is plain that an inmate deserves *adequate* medical care, he cannot insist that his institutional host provide him with the most sophisticated care that money can buy...
>
> We readily concede that an infirm prisoner ... might well receive more salubrious or beneficial health care at home than in prison-and certainly, under more comforting circumstances. Yet, that is not a fair comparison. A penitentiary-like any institution-must deal with persons as part of an overall group...We are not so naive as to think that the Bureau could function at all if it were compelled to match-for each and every inmate-the level of medical care, cuisine, or educational resources that the convict could obtain in his own backyard. To insist on such an unrealistic paradigm would create an administrative nightmare.

In conclusion, the agency decisions made by the Bureau of Prisons are outside the jurisdiction of this court. If the BOP determines that it is unable to accommodate Kitchin's needs,

it is legally authorized pursuant to 18 U.S.C. §3582(c) to motion this court for a compassionate release.  In the meantime, Kitchin must seek relief through the administrative remedies provided by the BOP.  Accordingly, this court has no jurisdiction over the issues raised in this matter.

Entered: April 24, 2007

s/ William C. Lee
William C. Lee
United States District Judge



U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

Reformatted to renumber pages and remove CN notations from chapters 4/2/07.

**OPI:** OGC
**NUMBER:** 1330.13
**DATE:** 8/13/2002
**SUBJECT:** Administrative Remedy Program

**RULES EFFECTIVE DATE:** 8/6/2002

1. [<u>PURPOSE AND SCOPE</u> §542.10

   a. <u>Purpose</u>.  The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement.  An inmate may not submit a Request or Appeal on behalf of another inmate.

   b. <u>Scope</u>.  This Program applies to all inmates in institutions operated by the Bureau of Prisons, to inmates designated to contract Community Corrections Centers (CCCs) under Bureau of Prisons responsibility, and to former inmates for issues that arose during their confinement.  This Program does not apply to inmates confined in other non-federal facilities.]

   The president of a recognized inmate organization may submit a request on behalf of that organization regarding an issue that specifically affects that organization.

   [c. <u>Statutorily-mandated Procedures</u>.  There are statutorily-mandated procedures in place for Tort claims (28 CFR 543, subpart C), Inmate Accident Compensation claims (28 CFR 301), and Freedom of Information Act or Privacy Act requests (28 CFR 513, subpart D).  If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures.]

2. **PROGRAM OBJECTIVES.**  The expected results of this program are:

   a.  A procedure will be available by which inmates will be able to have any issue related to their incarceration formally reviewed by high-level Bureau officials.

   b.  Each request, including appeals, will be responded to
within the time frames allowed.

   c.  A record of Inmate Administrative Remedy Requests and
Appeals will be maintained.

   d.  Bureau policies will be more correctly interpreted and
applied by staff.

3.  **DIRECTIVES AFFECTED**

   a.  **Directive Rescinded**

      PS 1330.11    Administrative Remedy Procedure for Inmates
                    (10/29/93)

   b.  **Directives Referenced**

      PS 1320.05    Claims Under the Federal Tort Claims Act
                    (6/28/00)
      PS 4500.04    Trust Fund Manual (12/15/95)
      PS 5212.07    Control Unit Programs (02/20/01)
      PS 5214.04    HIV, Handling of Inmates Testing Positive
                    (2/4/98)
      PS 5264.06    Telephone Regulations for Inmates (12/22/95)
      PS 5270.07    Inmate Discipline and Special Housing Units
                    (12/29/87)
      PS 5890.13    SENTRY-National On-Line Automated Information
                    System (12/14/99)

      28 CFR 301    Inmate Accident Compensation
      28 CFR 16.10  Fees (for records requested pursuant to the
                    Freedom of Information Act (FOIA))

   c.  Rules cited in this Program Statement are contained in
28 CFR 542.10 through 542.19.

4.  **STANDARDS REFERENCED**

   a.  American Correctional Association 3rd Edition Standards for
Adult Correctional Institutions:  3-4236 and 3-4271

   b.  American Correctional Association 3rd Edition Standards for
Adult Local Detention Facilities:  3-ALDF-3C-22, and
3-ALDF-3E-11

5.  **[RESPONSIBILITY §542.11**

   **a.  The Community Corrections Manager (CCM), Warden, Regional
Director, and General Counsel are responsible for the
implementation and operation of the Administrative Remedy Program**

at the Community Corrections Center (CCC), institution, regional and Central Office levels, respectively, and shall:

**(1)   Establish procedures for receiving, recording, reviewing, investigating and responding to Administrative Remedy Requests (Requests) or Appeals (Appeals) submitted by an inmate;]**

See Section 13 for further information on remedy processing, including use of SENTRY.

**[(2)   Acknowledge receipt of a Request or Appeal by returning a receipt to the inmate;]**

The receipt is generated via SENTRY.

**[(3)   Conduct an investigation into each Request or Appeal;**

**(4)   Respond to and sign all Requests or Appeals filed at their levels.  At the regional level, signatory authority may be delegated to the Deputy Regional Director.  At the Central Office level, signatory authority may be delegated to the National Inmate Appeals Administrator.  Signatory authority extends to staff designated as acting in the capacities specified in this §542.11, but may not be further delegated without the written approval of the General Counsel.]**

§ 542.11 refers to Section 5 of this Program Statement.

For purposes of this Program Statement, the term "institution" includes Community Corrections Centers (CCCs); the term "Warden" includes Camp Superintendents and Community Corrections Managers (CCMs) for Requests filed by CCC inmates; and the term "inmate" includes a former inmate who is entitled to use this program.

(5)   The Warden shall appoint one staff member, ordinarily above the department head level, as the Administrative Remedy Coordinator (Coordinator) and one person to serve as Administrative Remedy Clerk (Clerk).  The Regional Director and the National Inmate Appeals Administrator, Office of General Counsel, shall be advised of these appointees and any subsequent changes.

To coordinate the regional office program, each Regional Director shall also appoint an Administrative Remedy Coordinator of at least the Regional Administrator level, ordinarily the Regional Counsel, and an Administrative Remedy Clerk.  The National Inmate Appeals Administrator, Office of General Counsel, shall be advised of these appointees and any subsequent changes.

(6)   The Administrative Remedy Coordinator shall monitor the program's operation at the Coordinator's location and shall ensure that appropriate staff (e,g., Clerk, unit staff) have the

knowledge needed to operate the procedure.  The Coordinator is responsible for signing any rejection notices and ensuring the accuracy of SENTRY entries, e.g., abstracts, subject codes, status codes, and dates.  The Coordinator also shall serve as the primary point of contact for the Warden or Regional Director in discussions of Administrative Remedies appealed to higher levels.

(7)  The Administrative Remedy Clerk shall be responsible for all clerical processing of Administrative Remedies, for accurately maintaining the SENTRY index, and for generating SENTRY inmate notices.

(8)  The Unit Manager is responsible for ensuring that inmate notices (receipts, extension notices, and receipt disregard notices from institutions, regions and the Central Office) are printed and delivered daily for inmates in their units and for deleting those notices from SENTRY promptly after delivery to the inmate.  CCMs are responsible for this function for inmates under their supervision.

**[b.  Inmates have the responsibility to use this Program in good faith and in an honest and straightforward manner.]**

6.  **RESERVED**

7.  **[INFORMAL RESOLUTION §542.13**

**a.  Informal Resolution.  Except as provided in §542.13(b), an inmate shall first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each warden shall establish procedures to allow for the informal resolution of inmate complaints.]**

The Warden is responsible for ensuring that effective informal resolution procedures are in place and that good faith attempts at informal resolution are made in an orderly and timely manner by both inmates and staff.  These procedures may not operate to limit inmate access to formal filing of a Request.

**[b.  Exceptions.  Inmates in CCCs are not required to attempt informal resolution.  An informal resolution attempt is not required prior to submission to the regional or Central Office as provided for in §542.14(d) of this part.  An informal resolution attempt may be waived in individual cases at the Warden or institution Administrative Remedy Coordinator's discretion when the inmate demonstrates an acceptable reason for bypassing informal resolution.]**

For example, the Warden may waive informal resolution for Unit Discipline Committee (UDC) appeals, or when informal resolution is deemed inappropriate due to the issue's sensitivity.

     Although not mandatory, inmates may attempt informal resolution
of DHO decisions.  See the Program Statement on Inmate Discipline
and Special Housing Units.

8.  [**<u>INITIAL FILING</u>**.  **§542.14**

     **a.  <u>Submission</u>.  The deadline for completion of informal
resolution and submission of a formal written Administrative
Remedy Request, on the appropriate form (BP-9), is 20 calendar
days following the date on which the basis for the Request
occurred.]**

     In accord with the settlement in <u>Washington v. Reno</u>, and for
such period of time as this settlement remains in effect, the
deadline for completing informal resolution and submitting a
formal written Administrative Remedy Request, on the appropriate
form (BP-9), for a disputed telephone charge, credit, or
telephone service problem for which the inmate requests
reimbursement to his/her telephone account, is 120 days from the
date of the disputed telephone charge, credit, or telephone
service problem.

     Administrative Remedy Requests concerning telephone issues that
do not involve billing disputes or requests for refunds for
telephone service problems (such as Administrative Remedy
Requests concerning telephone privileges, telephone lists, or
telephone access) are governed by the 20-day filing deadline.

     [**b.  <u>Extension</u>.  Where the inmate demonstrates a valid reason
for delay, an extension in filing time may be allowed.  In
general, valid reason for delay means a situation which prevented
the inmate from submitting the request within the established
time frame.  Valid reasons for delay include the following:  an
extended period in-transit during which the inmate was separated
from documents needed to prepare the Request or Appeal;  an
extended period of time during which the inmate was physically
incapable of preparing a Request or Appeal;  an unusually long
period taken for informal resolution attempts; indication by an
inmate, verified by staff, that a response to the inmate's
request for copies of dispositions requested under §542.19 of
this part was delayed.]**

     Ordinarily, the inmate should submit written verification from
staff for any claimed reason for delay.

     If an inmate requests an Administrative Remedy form but has not
attempted informal resolution, staff should counsel the inmate
that informal resolution is ordinarily required.  If the inmate
nevertheless refuses to present a request informally, staff
should provide the form for a formal Request.  Upon receipt of
the inmate's submission, the Coordinator shall accept the Request
if, in the Coordinator's discretion, informal resolution was

bypassed for valid reasons, or may reject it if there are no
valid reasons for bypassing informal resolution.

**[c.  <u>Form</u>**

**     (1)  The inmate shall obtain the appropriate form from CCC
staff or institution staff (ordinarily, the correctional
counselor).]**

     The following forms are appropriate:

     ♦  Request for Administrative Remedy, Form BP-9, is
appropriate for filing at the institution;
     ♦  Regional Administrative Remedy Appeal, Form BP-10, is
appropriate for submitting an appeal to the regional office;
     ♦  Central Office Administrative Remedy Appeal, Form BP-11,
is appropriate for submitting an appeal to the Central Office.

     **[(2)  The inmate shall place a single complaint or a
reasonable number of closely related issues on the form.  If the
inmate includes on a single form multiple unrelated issues, the
submission shall be rejected and returned without response, and
the inmate shall be advised to use a separate form for each
unrelated issue.  For DHO and UDC appeals, each separate incident
report number must be appealed on a separate form.]**

     Placing a single issue or closely related issues on a single
form facilitates indexing, and promotes efficient, timely and
comprehensive attention to the issues raised.

     **[(3)  The inmate shall complete the form with all requested
identifying information and shall state the complaint in the
space provided on the form.  If more space is needed, the inmate
may use up to one letter-size (8 1/2" by 11") continuation page.
The inmate must provide an additional copy of any continuation
page.  The inmate must submit one copy of supporting exhibits.
Exhibits will not be returned with the response.  Because copies
of exhibits must be filed for any appeal (see § 542.15 (b) (3)),
the inmate is encouraged to retain a copy of all exhibits for his
or her personal records.**

     **(4)  The inmate shall date and sign the Request and submit
it to the institution staff member designated to receive such
Requests (ordinarily a correctional counselor).  CCC inmates may
mail their Requests to the CCM.]**

     The correctional counselor shall submit the form promptly
(ordinarily not later than the next business day) to the Clerk
for processing.

[d.  **Exceptions to Initial Filing at Institution**

(1)  **Sensitive Issues**.  If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director.  The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution.  If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted.  Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request.  The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden.  The Warden shall allow a reasonable extension of time for such a resubmission.

(2)  **DHO Appeals**.  DHO appeals shall be submitted initially to the Regional Director for the region where the inmate is currently located.]

See the Program Statement on Inmate Discipline and Special Housing Units.

[(3)  **Control Unit Appeals**.  Appeals related to Executive Panel Reviews of Control Unit placement shall be submitted directly to the General Counsel.]

See the Program Statement on Control Unit Programs.

[(4)  **Controlled Housing Status Appeals**.  Appeals related to the Regional Director's review of controlled housing status placement may be filed directly with the General Counsel.]

See the Program Statement on Procedures for Handling HIV Positive Inmates Who Pose Danger to Others.

9.  [**APPEALS** § 542.15

a.  **Submission**.  An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response.  An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response.  When the inmate demonstrates a valid reason for delay, these time limits may be extended.  Valid reasons for delay include those situations described in §542.14(b) of this part.  Appeal to the General Counsel is the final administrative appeal.]

These deadlines specify the date of the Appeal's receipt in the regional office or the Central Office.  The deadlines have been made deliberately long to allow sufficient mail time.  Inmates should mail their Appeals promptly after receiving a response to ensure timely receipt.  Ordinarily, the inmate must submit written verification from institution staff for any reason for delay that cannot be verified through SENTRY.

In many cases, courts require a proper Appeal to the General Counsel before an inmate may pursue the complaint in court.

   [b. **Form**

       (1)  **Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP-10) and accompanied by one complete copy or duplicate original of the institution Request and response.  Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP-11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses.  Appeals shall state specifically the reason for appeal.**

       (2)  **An inmate may not raise in an Appeal issues not raised in the lower level filings.  An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.**

       (3)  **An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form.  If more space is needed, the inmate may use up to one letter-size (8 1/2" x 11") continuation page.  The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal).  The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal (see 28 CFR part 503 for addresses of the Central Office and Regional Offices).]**

   c.  Processing.  The appropriate regional office to process the Appeal is the regional office for the institution where the inmate is confined at the time of mailing the Appeal, regardless of the institution that responded to the institution filing.

10.  [**ASSISTANCE** §542.16

   a.  **An inmate may obtain assistance from another inmate or from institution staff in preparing a Request or an Appeal.  An inmate may also obtain assistance from outside sources, such as family members or attorneys.  However, no person may submit a Request or**

**Appeal on the inmate's behalf, and obtaining assistance will not be considered a valid reason for exceeding a time limit for submission unless the delay was caused by staff.**

**b.  Wardens shall ensure that assistance is available for inmates who are illiterate, disabled, or who are not functionally literate in English.  Such assistance includes provision of reasonable accommodation in order for an inmate with a disability to prepare and process a Request or an Appeal.]**

For example, Wardens must ensure that staff (ordinarily unit staff) provide assistance in the preparation or submission of an Administrative Remedy or an Appeal upon being contacted by such inmates that they are experiencing a problem.

11.  **[RESUBMISSION  §542.17**

**a.  Rejections.  The Coordinator at any level (CCM, institution, region, Central Office) may reject and return to the inmate without response a Request or an Appeal that is written by an inmate in a manner that is obscene or abusive, or does not meet any other requirement of this part.**

**b.  Notice.  When a submission is rejected, the inmate shall be provided a written notice, signed by the Administrative Remedy Coordinator, explaining the reason for rejection.  If the defect on which the rejection is based is correctable, the notice shall inform the inmate of a reasonable time extension within which to correct the defect and resubmit the Request or Appeal.]**

(1)  Sensitive Submissions.  Submissions for inmate claims which are too sensitive to be made known at the institution are not to be returned to the inmate.  Only a rejection notice will be provided to the inmate.  However, other rejected submissions ordinarily will be returned to the inmate with the rejection notice.

(2)  Defects.  Defects such as failure to sign a submission, failure to submit the required copies of a Request, Appeal, or attachments, or failure to enclose the required single copy of lower level submissions are examples of correctable defects.  Ordinarily, five calendar days from the date of the notice to the inmate is reasonable for resubmission at the institution level; at least 10 calendar days at the CCM or regional offices; and 15 calendar days at the Central Office.

(3)  Criteria for Rejection.  When deciding whether to reject a submission, Coordinators, especially at the institution level, should be flexible, keeping in mind that major purposes of this Program are to solve problems and be responsive to issues inmates raise.  Thus, for example, consideration should be given to accepting a Request or Appeal that raises a sensitive or problematic issue, such as medical treatment, sentence

computation, staff misconduct, even though that submission may be somewhat untimely.

   [c.  **Appeal of Rejections**.  When a Request or Appeal is rejected and the inmate is not given an opportunity to correct the defect and resubmit, the inmate may appeal the rejection, including a rejection on the basis of an exception as described in §542.14 (d), to the next appeal level.  The Coordinator at that level may affirm the rejection, may direct that the submission be accepted at the lower level (either upon the inmate's resubmission or direct return to that lower level), or may accept the submission for filing.  The inmate shall be informed of the decision by delivery of either a receipt or rejection notice.]

12.  [**RESPONSE TIME**  §542.18.  If accepted, a Request or Appeal is considered filed on the date it is logged into the Administrative Remedy Index as received.  Once filed, response shall be made by the Warden or CCM within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days.  If the Request is determined to be of an emergency nature which threatens the inmate's immediate health or welfare, the Warden shall respond not later than the third calendar day after filing.  If the time period for response to a Request or Appeal is insufficient to make an appropriate decision, the time for response may be extended once by 20 days at the institution level, 30 days at the regional level, or 20 days at the Central Office level. Staff shall inform the inmate of this extension in writing.  Staff shall respond in writing to all filed Requests or Appeals.  If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level.]

The date a Request or an Appeal is received in the Administrative Remedy index is entered into SENTRY as the "Date Rcv", and should be the date it is first received and date-stamped in the Administrative Remedy Clerk's office.  Notice of extension ordinarily is made via SENTRY notice.

13.  REMEDY PROCESSING

a.  Receipt. Upon receiving a Request or Appeal, the Administrative Remedy Clerk shall stamp the form with the date received, log it into the SENTRY index as received on that date, and write the "Remedy ID" as assigned by SENTRY on the form. Once a submission is entered into the system, any subsequent submissions or appeals of that case shall be entered into SENTRY using the same Case Number.  The "Case Number" is the purely numerical part of the "Remedy ID" which precedes the hyphen and "Submission ID."

All submissions received by the Clerk, whether accepted or
rejected, shall be entered into SENTRY in accordance with the
SENTRY Administrative Remedy Technical Reference Manual.

Sensitive issues, when the inmate claims that his or her safety
or well-being would be placed in danger if it became known at the
institution that the inmate was pursuing the issue, should be
withheld from logging in until answered and/or should be logged
into SENTRY with sufficient vagueness as to subject code and
abstract to accommodate the inmate's concerns.

 A Request should be submitted and logged in at the institution
where the inmate is housed at the time the inmate gives the
Request to the counselor or other appropriate staff member.  If
the event(s) occurred at a previous institution, staff at that
previous institution shall provide, promptly upon request, any
investigation or other assistance needed by the institution
answering the Request.  If an inmate is transferred after
giving the Request to a staff member, but before that Request is
logged in or answered, the institution where the Request was
first given to a staff member remains responsible for logging and
responding to that Request.

b.  Investigation and Response Preparation.  The Clerk or
Coordinator shall assign each filed Request or Appeal for
investigation and response preparation.  Matters in which
specific staff involvement is alleged may not be investigated by
either staff alleged to be involved or by staff under their
supervision.

Allegations of physical abuse by staff shall be referred to the
Office of Internal Affairs (OIA) in accordance with procedures
established for such referrals.  Where appropriate, e.g., when
OIA or another agency is assuming primary responsibility for
investigating the allegations, the response to the Request or
Appeal may be an interim response and need not be delayed pending
the outcome of the other investigation.

Requests or Appeals shall be investigated thoroughly, and all
relevant information developed in the investigation shall
ordinarily be supported by written documents or notes of the
investigator's findings.  Notes should be sufficiently detailed
to show the name, title, and location of the information
provided, the date the information was provided, and a
full description of the information provided.  Such documents and
notes shall be retained with the case file copy.  When deemed
necessary in the investigator's discretion, the investigator may
request a written statement from another staff member regarding
matters raised in the Request or Appeal.  Requested staff shall
provide such statements promptly.  For a disciplinary Appeal, a
complete copy of the appealed disciplinary actions record shall
be maintained with the Appeal file copy.

c. <u>Responses</u>.  Responses ordinarily shall be on the form
designed for that purpose, and shall state the decision reached
and the reasons for the decision.  The first sentence or two of a
response shall be a brief abstract of the inmate's Request or
Appeal, from which the SENTRY abstract should be drawn.  This
abstract should be complete, but as brief as possible.  The
remainder of the response should answer completely the Request or
Appeal, be accurate and factual, and contain no extraneous
information.  The response should be written to be released to
any inmate and the general public under the Freedom of
Information Act (FOIA) and the Privacy Act.  Inmate names shall
not be used in responses, and staff and other names may not be
used unless absolutely essential.

Program Statements, Operations Memoranda, regulations, and
statutes shall be referred to in responses whenever applicable,
including section numbers on which the response relies.

d. <u>Response Time Limits</u>.  Responses shall be made as required
in Section 11 of this Program Statement.

e. <u>Index Completion</u>.  When a response is completed, the Clerk
shall update SENTRY in accordance with the SENTRY Administrative
Remedy Manual and the instructions in Attachment A.  Particular
attention should be paid to updating the status date, code, and
reason, and to making any changes to the subject code and
abstract indicated by the Coordinator or by the response drafter.
The abstract shall be taken from the response's first paragraph.
Abbreviations may be liberally used, as long as they are easily
understood, to allow as complete a description of the issue in
the 50 characters allotted.  For consistency, the Administrative
Remedy Coordinator shall approve the closing entry, including the
subject codes, status code and reason, and abstract before the
closing entry is made by the Clerk.

f. <u>Response Distribution</u>.  For an institution response, one
copy of the complete Request and response shall be maintained in
the Warden's Administrative Remedy File together with all
supporting material.  Three copies shall be returned to the
inmate.  An inmate who subsequently appeals to the regional or
Central Office shall submit one copy with each appeal.

One copy of a Regional Appeal and response shall be retained at
the regional office.  One copy shall be sent to the Warden at the
original filing location.  The remaining two copies shall be
returned to the inmate; one to submit in case of subsequent
appeal to the Central Office, and one to retain.

One copy of a Central Office Appeal and response will be
returned to the inmate.  One copy will be retained in the Central
Office Administrative Remedy File, one copy will be forwarded to
the regional office where the Regional Appeal was answered, and

one to the Warden's Administrative Remedy File at the original
filing location.

   g.  <u>File Maintenance</u>.  The Warden's Administrative Remedy File
and Administrative Remedy Files at the Regional Offices and
Central Office shall be maintained in a manner that assures case
files are readily accessible to respond to inquiries from Federal
Bureau of Prison staff, inmates and the public.  Institutions
shall file Regional and Central Office response copies with the
inmate's institution submission copy.  Regional offices shall
file copies of Central Office responses with the inmate's
Regional Appeal file.  Each location shall maintain copies of
supporting material and investigation notes with the case file.

   When a Regional or Central Office Appeal was not preceded by a
lower level filing, the institution and regional copies shall be
filed at the institution and region having responsibility for the
inmate at the time of response.

   To provide information and feedback, Wardens and Regional
Directors are encouraged to route response file copies from
subsequent appeal levels to the Coordinator and the appropriate
department head or person who investigated and drafted the
response at their respective levels.

**14.  [<u>ACCESS TO INDEXES AND RESPONSES</u> §542.19.  Inmates and
members of the public may request access to Administrative Remedy
indexes and responses, for which inmate names and Register
Numbers have been removed, as indicated below.  Each institution
shall make available its index, and the indexes of its regional
office and the Central Office.  Each regional office shall make
available its index, the indexes of all institutions in its
region, and the index of the Central Office.  The Central Office
shall make available its index and the indexes of all
institutions and regional offices.  Responses may be requested
from the location where they are maintained and must be
identified by Remedy ID number as indicated on an index.  Copies
of indexes or responses may be inspected during regular office
hours at the locations indicated above, or may be purchased in
accordance with the regular fees established for copies furnished
under the Freedom of Information Act (FOIA).]**

At present, fees are detailed in 28 CFR § 16.10, which specifies
a charge of $.10 per page duplicated and no charge for the first
100 pages.  Staff shall forward funds received for purchase of
index and response copies to the FOIA/Privacy Act Section, Office
of General Counsel, Central Office.

Any location may produce its index or that of another location by
making the appropriate entries on a SENTRY retrieval transaction,
and specifying the "SAN" (sanitized) output format.

15.  <u>RECORDS MAINTENANCE AND DISPOSAL</u>

   a.  <u>Disposal Authority</u>.  The authority for Administrative
Remedy records disposal is the "job number" NC1-129-83-7 provided
by the National Archives.

   b.  <u>Administrative Remedy Indexes</u>.  SENTRY Administrative
Remedy indexes shall be maintained in computer accessible form
for 20 years, then destroyed.  Pre-SENTRY indexes shall be
maintained at the site of creation for 20 years, then destroyed.

   c.  <u>Administrative Remedy Case Files</u>.  Administrative Remedy
Case Files shall be destroyed three full years after the year in
which the cases were completed (i.e., response completed).  For
cases submitted since implementation of the SENTRY module (July
1990), at the end of each calendar year (beginning at end of
1993), run SENTRY index retrieval transactions to identify the
lowest case number for cases <u>answered</u> (status = cl* and status
date in the appropriate range) during the calendar year ended
three years previously.  Cases below that number must be
destroyed.  Thus, cases answered in 1990 would be destroyed at
the end of 1993; cases answered in 1991 would be destroyed at the
end of 1994, etc.

   To identify the lowest case number for cases answered during a
given year, it may be necessary to check indexes with "Date
Received" in the year in question as well as those with "Date
Received" in the previous year.

   Cases maintained under the pre-SENTRY numbering and filing
system should be destroyed according to the following schedule:

| YEAR OF CASE # | DESTROY AT END OF |
|----------------|-------------------|
| 94 | 1998 |
| 95 | 1999 |
| 96 | 2000 |
| 97 | 2001 |

16.  <u>INSTITUTION SUPPLEMENT</u>.  Each Warden shall forward a copy of
any Institution Supplement developed to implement this Program
Statement to the Regional Administrative Remedy Coordinator and
to the National Inmate Appeals Administrator in the Central
Office.

                          \s\
                          Kathleen M. Hawk
                          Director

U.S. Department of Justice
Federal Bureau of Prisons
*Federal Medical Center*
*Rochester, MN 55904-4600*

# Institution Supplement

| | |
|---|---|
| **OPI:** | AW (Operations) |
| **NUMBER:** | RCH1330.13g |
| **DATE:** | January 17, 2006 |
| **SUBJECT:** | Administrative Remedy Program |

1.  <u>PURPOSE</u>.  The purpose of this Institution Supplement is to establish procedures for the informal resolution of inmate grievances and for the formal presentation of complaints through the Administrative Remedy Program.

2.  <u>DIRECTIVES AFFECTED</u>.

    a.  <u>Directives Rescinded</u>.

RCH1330.13f        Administrative Remedy Program (04/06/05)

    b.  <u>Directives Referenced</u>.

P.S. 1330.13        Administrative Remedy Program (12/22/95)

3.  <u>STANDARDS REFERENCED</u>.

    a.  American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4248, 4-4301, and 4-4284

4.  <u>AREAS OF RESPONSIBILITY</u>.  The Associate Warden (Operations) is appointed as the Administrative Remedy Coordinator to supervise the operation of the Administrative Remedy Program.  The Warden's Secretary is appointed as the Administrative Remedy Clerk.

5.  <u>PROCEDURES</u>.

    a.  <u>Informal Resolution</u>.  Prior to the filing of a formal Administrative Remedy Request (Form BP-9, hereinafter BP-229), an inmate must attempt to informally resolve his complaint unless it is filed as a sensitive complaint.  Inmates have the responsibility to present complaints in good faith and in an honest, straight forward manner.  Inmates are advised that if they refuse good faith attempts and discussions with the appropriate correctional counselor about their complaint, their BP-229 may be rejected by the Administrative Remedy Coordinator for not attempting informal resolution prior to submission of an Administrative Remedy.

Prior to requesting a BP-229 form, an inmate shall attempt to informally resolve his grievance with the assistance of a correctional counselor.  Once the informal resolution process has begun, the correctional counselor will initiate an Administrative Remedy routing form (Attachment B) to monitor processing of the BP-229.  Correctional counselors will document all actions taken and attempts made at informal resolution on the Attempt at Informal Resolution form. (Attachment A)

Correctional counselors ordinarily will use a maximum of two working days to investigate and resolve a grievance.  An extension of one additional working day may be granted with the documented approval of the unit manager.  An inmate who has been unsuccessful at informal resolution may request a BP-229 form.  For accountability, BP-229 forms will be distributed by the correctional counselors only.  The correctional counselors will also keep a log indicating all pertinent information in reference to the informal

resolution and the BP-229, to include (but not limited to) the inmate's name, register number, complaint, date informal resolution began, etc.

When the inmate returns the completed BP-229 for processing, the counselor shall ensure the inmate's complaint is consistent with the attempted informal resolution as documented on the Attempt at Informal Resolution form.  If the inmate's written complaint is substantially different from the Attempt at Informal Resolution form, the informal resolution process will begin again.

     b.   <u>Filing</u>.

       1)   The counselor will ensure the inmate has signed the BP-229 and that the date of signing is consistent with the date the inmate submitted the BP-229 to the counselor.  If more space is needed, the inmate may use up to one letter size (8 1/2" by 11") continuation page with one additional copy to be provided by the inmate.  If the inmate references supporting exhibits, he must submit one copy of each supporting exhibit.  Exhibits will not be returned with the response.

       2)   All BP-229 forms that have been rejected will be returned to the inmate with a rejection notice indicating the reason for the rejection.

       3)   Upon receipt of a completed BP-229 form from the inmate, the counselor will submit the BP-229 form, the Attempt at Informal Resolution form, and the Administrative Remedy routing form to the Warden's Office for processing.  The Administrative Remedy Clerk will log the BP-229 into SENTRY.  Both accepted and rejected remedies shall be entered into the SENTRY index system.

       4)   Sensitive complaints may be filed directly with the Regional Director on a BP-229 if the requirements of Paragraph 8, Section d, of the Program Statement are met.  Correctional counselors will provide the inmate with a BP-229 form for filing such complaints without the attempt at informal resolution.

       5)   If the BP-229 is delivered by the inmate to the counselor on a weekend or holiday, the BP-229 will be delivered and receipted in the Warden's Office on the next work day.  The complaint is deemed filed as of the date of the receipt, not the date of the complaint.  The correctional counselor is responsible for retrieving the receipt from SENTRY and providing a copy to the inmate.

     c.   <u>Investigation of Complaints</u>.

       1)   Properly filed BP-229s will be assigned by the Administrative Remedy Coordinator to the department head in the area of responsibility for investigation and response.  The BP-229 will be placed in the department head's mailbox located in Building 9.

       2)   The Administrative Remedy Clerk will write the Remedy ID Number assigned by SENTRY on both rejected and accepted BP-229s in the response portion of the BP-229.

       3)   The department head shall have ten calendar days from the date of the receipt to complete the response.  Responses will be typed in the format shown.  (Attachment C)  Documentation which supports the response must be attached to the draft.

The department head will review, sign, and route the response to the respective Associate Warden who will review the Administrative Remedy and forward it to the Legal Department, who will then forward it to the Administrative Remedy Clerk.  The Administrative Remedy Clerk will review and

forward the response, including all investigative material, to the Warden for final review and approval.

Upon completing the response to the BP-229, the department head shall copy the WordPerfect file to <L:\GROUP\BP-9\> on the Local Area Network.  Upon reviewing the response, if minor changes are indicated by the Attorney-Advisor, Associate Warden, or the Administrative Remedy Clerk, they may do so and forward the amended response to the Warden.

    d.   <u>Withdrawal of Complaints</u>.  If an inmate wishes to withdraw his BP-229 and stop all action on the complaint, he must do so in writing.  The inmate will contact his respective correctional counselor or the investigating department head and indicate on the BP-229 his intent to withdraw his complaint.  This affirmation will be witnessed by staff and documented on the BP-229.

A copy of the BP-229, to include the inmate's receipt for the BP-229, shall be routed to the Administrative Remedy Clerk for filing and retention.

    e.   <u>Inmate Discipline</u>.  Incident reports which are heard by the Unit Discipline Committee (UDC), and where sanctions are imposed, are appealable at the institution level directly to the Warden on a BP-229, without attempting informal resolution.  However, an inmate may only appeal one incident report per BP-229.

Incident reports which are heard by the Discipline Hearing Officer (DHO), and where sanctions are imposed, are appealable directly to the Regional Director on a BP-230.

    f.   <u>Response Time Limits</u>.  Responses must be prepared and signed by the Warden within 20 calendar days of the date receipted.  If the period of time for response to a complaint is insufficient to make an appropriate decision, the time for response may be extended only once for an additional 20 calendar days.  The inmate shall be informed of the extension in writing via a SENTRY extension notice.  This notice will be generated by the Administrative Remedy Clerk.  The correctional counselor is responsible for providing a copy of the extension notice to the inmate.  Extensions should be infrequent and for good cause only.

    g.   <u>Appeals</u>.  An inmate who wishes to appeal a BP-229 response to the Regional Office may request a BP-230 form from the correctional counselor. The inmate must mail the BP-230 directly to the Regional Director using his own funds for postage.  If the inmate is indigent, he may request postage stamps at government expense.  He may do so in accordance with the Program Statement governing correspondence.

Inmates who wish to appeal the regional response to the Central Office can request a BP-11 (hereinafter, BP-231) from the correctional counselor.  The inmate must mail the BP-231 directly to the General Counsel, Central Office, using his own funds for postage.  Indigent inmates may obtain postage stamps in accordance with the Program Statement governing correspondence.

    h.   <u>Distribution/Counselor Responsibility</u>.  The Administrative Remedy Clerk will distribute responses to the units via inmate mail, which is disseminated during mail call.

    i.   <u>Records</u>.  A record of complaints filed under these procedures will be maintained by the Administrative Remedy Clerk.  All responses to Administrative Remedy Requests, including appeals, will be placed in the Administrative Remedy file maintained in the Warden's Office.

_____/s/_____

Marty C. Anderson
Warden

RCHI330.139

Attachment A

### FEDERAL MEDICAL CENTER, ROCHESTER, MINNESOTA
### REQUEST FOR ADMINISTRATIVE REMEDY
### ATTEMPT AT INFORMAL RESOLUTION

INMATE NAME: _____     REG. NO.:_____

_____

Bureau of Prisons Program Statement 1330.13, dated CN 4, 12/22/95, entitled
Administrative Remedy Program, requires that "before an inmate seeks formal
review of a complaint (with a BP-229), they must try to resolve the complaint
informally by presenting it to a staff member."  The staff member also must
try to resolve it informally before the inmate will be given the BP-229 form.

_____

1.    Write in this space, briefly, the inmate's complaint.  Include all
      details and facts which support his request.



2.    What action does the inmate wish to be taken to correct the situation?




3.    Indicate below the efforts made to resolve the matter.  Be specific, but
      brief.  Include names of staff contacted to effect resolution.




4.    Attach any pertinent documentation related to the inmate's complaint.




_____  _____  _____  _____
Staff Member's Name & Title    Unit              U.M. Initials      Date